IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| VERTEX SERVICES, LLC | CIVIL ACTION NO. _____ |
| VS. | |
| TETRA TECHNOLOGIES, INC. and TETRA APPLIED TECHNOLOGIES, LLC | JURY TRIAL REQUESTED |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Plaintiff, Vertex Services, LLC, complaining of Defendants TETRA Technologies, Inc., and TETRA Applied Technologies, LLC and would respectfully show as follows:

## I. PARTIES

1.1     Vertex Services, LLC ("Vertex") is a limited liability company existing under the laws of Texas with its principal place of business in Harris County, Southern District of Texas. Vertex Services, LLC provides offshore labor and staffing services for the energy industry. Its members are all citizens of the State of Texas.

1.2     TETRA Technologies, Inc. is a for-profit corporation existing under the laws of Delaware with its principal place of business in The Woodlands, Montgomery County, Texas and which does business in the State of Texas for the purpose of accumulating monetary profit. TETRA Technologies is an oil and gas offshore services company. Tetra may be served with process through its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

1.3     TETRA Applied Technologies, LLC, is a limited liability company existing under the laws of Delaware with its principal place of business in The Woodlands, Montgomery County,

1

Texas, which does business in the State of Texas for the purpose of accumulating monetary profit. TETRA Applied Technologies is a oil and gas offshore services company. TETRA Applied Technologies, LLC may be served with process through its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

1.4    TETRA Technologies, Inc. and TETRA Applied Technologies, LLC will be collectively referred to as "TETRA" and/or "Defendants".

## II. JURISDICTION AND VENUE

2.1    The Court has jurisdiction over the lawsuit under 18 U.S.C. § 1961, et seq. (Statutory jurisdiction under RICO); 28 U.S.C. § 1331 (jurisdiction for matters arising under 18 U.S.C. § 1962, et seq.); and 43 U.S.C. § 1337 (original jurisdiction for Acts of Congress regulating commerce).

2.2    The Court has personal jurisdiction over the Defendants, which, at all relevant times, resided, were found, had an agent in, or transacted business in the State of Texas, including the Southern District of Texas.

2.3    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2) because the Defendants reside in the Southern District of Texas and a substantial part of the events or omissions giving rise to the claims occurred in this District.  Venue is also proper in this District under the RICO venue provision contained in 18 U.S.C. § 1965.

## III. FACTS

3.1    TETRA is a geographically diversified oil and gas services company, focused on completion fluids and associated products and services, water management, frac flowback, production well testing, offshore rig cooling, compression services and equipment and selected offshore services, including the provision of offshore labor to other companies.  TETRA is a global

company with employees and operations on six continents.  It employs hundreds, if not thousands, of persons on its projects and has an ongoing need for workers to staff its projects.

3.2     TETRA's Offshore Services division provides customers with market-leading solutions for construction and is the market leader of decommissioning services in the Gulf of Mexico, focusing on the safe and efficient elimination of their abandonment liabilities. The largest asset, the *TETRA Hedron*, is a derrick barge with a 1,600-metric-ton lifting capacity, which is part of a suite of synergistic service lines including: Engineering and Project Management, Well Plug and Abandonment, Diving and Marine, Heavy Lift Derrick Barges, and Customized Cutting & Pressure Control Technologies.

3.3     Through a complex and illegal scheme, TETRA illegally hires overseas workers to work on their vessels in order to save money.  This ongoing depression of wages by TETRA results in the loss of benefits to American citizens and aliens lawfully admitted to the United States for permanent residence.  It also limited the amount that TETRA paid its labor providers since overseas workers were significantly cheaper to use than their American counterparts.

3.4     Vertex was a major source of offshore labor for TETRA.  Since 2009, Vertex has provided offshore labor to remove and install platforms and pipelines in the Gulf of Mexico and all maintenance related to derrick and pipeline barges.  Vertex offers offshore positions for all tasks from the Superintendent to the galley-hand.  All of Vertex's personnel are trained to the guidelines of the client and have multiple years of experience on the job.  In addition to providing American labor for manning requirements, Vertex also provides foreign labor with B-1 OCS visas when a company has received a U.S. Coast Guard exemption regarding foreign personnel.

3.5     Two statutes govern the employment of non-U.S. citizens as unlicensed crewmembers on board vessels working within the U.S. Outer Continental Shelf.

3.5.1    46 U.S.C. § 8103 (b) requires that each unlicensed seaman on a vessel like the *TETRA Hedron* must be either: a citizen of the United States or an "alien lawfully admitted to the [U.S.] for permanent residence." The statute further limits the number of foreign workers by providing that no more than 25 percent of the total unlicensed seamen on board can be aliens lawfully admitted for permanent residence.

3.5.2    43 U.S.C. § 1356 requires that the Secretary of the Department in which the Coast Guard is operating issue regulations which require any vessel, rig, platform, or other vehicle or structure be manned "by citizens of the United States or aliens lawfully admitted to the United States for permanent residence."

3.6    Both of the statutes contain a provision under which the U.S. Coast Guard may issue a waiver for the employment of other legal aliens **when there are not U.S. citizens or permanent resident aliens qualified for work available**.

3.7    The effect of the statutes is that all crewmembers on a vessel operating in the OCS must be either U.S. citizens or permanent resident aliens or they must possess a valid waiver from the Coast Guard and be in full compliance with the conditions of the waiver. Without a waiver from the Coast Guard, foreign workers who are not permanent resident aliens are not permitted, and the maximum number of permanent resident aliens that may be employed is 25 percent of the total number of unlicensed seamen on board a vessel.

**FOREIGN OFFSHORE LABOR EXEMPTION PROCESS**

3.8    There are procedures in place for all owner/operators who believe they qualify for an exemption from the citizenship requirements discussed above.  Coast Guard enacted regulations require that at least 30 days prior to a project start up date, an employer must demonstrate to the Coast Guard his attempts to employ U.S. citizens.   The exemption request must include:

3.8.1   A detailed job description, with list of qualifications, for each position requiring a waiver including the catalog number of the position requested from the Dictionary of Occupational Titles (DOT).  If the position requested cannot be specifically identified, then its nearest approximation.

3.8.2   In reviewing qualifications required for the positions where there is an obvious seniority relationship, the listed experience factors should reflect this. For example; the senior electrician would normally be expected to need more experience and knowledge than one of his assistants. Further, qualifications being requested should not be any more stringent than those required of recent non-U.S. citizen personnel hired at the time such personnel were first hired.

3.8.3   Documented proof of attempts to find employees through normal private sources including advertisements in widely circulated newspapers for at least three days; advertising in at least one edition of a large mineral and oil industry trade magazine and proof of correspondence with maritime and/or oil industry related employment agencies and other appropriate suppliers of workers. Included should be, by position, a summation of numbers of applications received, numbers of interviews granted, numbers hired, and reasons workers not qualified. Companies often utilize online job-search websites provided by both the Texas Workforce Commission and Louisiana Workforce Commission.  A description of the owner/operators training program should be submitted to show their intended efforts to train U.S. citizens for employment on the Shelf.

3.9     The Coast Guard will, upon receipt of this information, decide if the exemption is needed and if recruitment via the private sector was actively pursued. In the event that this information is judged insufficient, the owner/operator will be contacted for any additional material.

3.10    If it is determined that the provided information is adequate, then the material will be forwarded to Department of Labor (DOL).  DOL will then review all the information they have

received and determine if any qualified U.S. workers are available. If there are none, the Coast Guard will be notified, pursue the matter no further and issue the exemption.

3.11     Waivers are issued for one year periods and must be reapplied for at the end of that year. The procedures followed for the initial waiver will be applicable to renewals with the addition of an update on what efforts have been made to recruit and/or train personnel in the intervening year. Proof of advertisements for the past year should be submitted as well as a summary of the effects such advertisements have had. Further, if any new foreign nationals were hired to any exempted positions listed for the previous year, and for which another exemption is sought, it will be necessary to attach that employee's qualifications and experience to the new request.

### WAIVER ISSUED TO TETRA FOR THE *D/B TETRA HEDRON*

3.12     TETRA's Heavy Lift Group provides technical expertise and capability to handle various offshore projects, utilizing a fleet of derrick barges. With a lift capacity of up to 1,700 short tons, these barges are a good fit for accommodating the installation and decommissioning of various topside and jacket structures.   TETRA has relied on three of these barges to perform work in the OCS: *TETRA Hedron*, *Arapaho*, and *DB-1*.

3.13     In August 2011, TETRA purchased the *TETRA Hedron* from two Chinese shipbuilding companies for a reported $71 million.   At the time of the purchase, Stuart Brightman, TETRA's President and Chief Executive Officer stated: "The *TETRA Hedron* will enhance our ability to remove larger structures and it will complement our existing heavy lift, diving, plug and abandonment, and cutting services. During the second quarter, we have hired and trained the majority of the key personnel needed to operate the *Hedron*. Initial feedback from our customers regarding our purchase of the *Hedron* has been very favorable, and we have a growing backlog of

work waiting for the *Hedron*'s anticipated fourth quarter debut in the Gulf of Mexico." Brightman made no mention of the use of the foreign labor that would be sent to the vessel.

3.14    Beginning with its purchase of the *TETRA Hedron*, the company has requested and received a U.S. Coast Guard waiver of the prohibition against foreign labor contained in 46 U.S.C. § 8103 (b) and 43 U.S.C. § 1356 for the vessel. Although this exemption expires every year, on information and belief, TETRA has sought and received a renewal of the foreign labor exemption for the *TETRA Hedron* every year it has operated it.

3.15    As a result of their operation of three barges, TETRA believed it was short on qualified personnel requiring it to pursue foreign labor exemptions from the Coast Guard. During this time period TETRA also maintained an exemption on one of its other barges, the *DB-1*.

3.16    In 2013, TETRA required additional workers on the *DB-1*. Although TETRA had previously received a foreign labor exemption for the *DB-1*, this exemption expired in late 2012. When asked whether Vertex could provide foreign labor for positions on the *DB-1*, Vertex declined and informed TETRA that foreign workers could not be used on that vessel without a valid U.S. Coast Guard exemption. Without contacting Vertex, TETRA simply re-assigned multiple welders who were on the *TETRA Hedron* to illegally work on the *DB-1*. At the time the workers were re-assigned to the *DB-1*, the vessel was docked at Port Fourchon, Louisiana. The foreign workers performed completion work and maintenance on the barge.

3.17    In February 2014, TETRA sold the *DB-1*. The cessation of the *DB-1* created an immediate surplus of American workers for TETRA to use on the remaining two barges. At the time it was sold, TETRA no longer needed to spread its personnel over three vessels. At that point in time, TETRA was legally required to redeploy all the American workers who were previously on the *DB-1* to perform jobs on the *Arapaho* or the *TETRA Hedron*.

7

3.18    In January 2014 Vertex renewed the personnel contract with TETRA.  When the contract was renewed, Vertex increased the cost of foreign labor, and reduced American rates. Vertex informed TETRA at that time there was an abundance of American labor available that Vertex was able to supply that would meet the labor needs of TETRA.  TETRA refused this offer and continued to misrepresent to the United States Coast Guard that there was an absence of American workers available to fill these positions.

3.19    Since 2014, the foreign workers arrived each year before American employees were re-hired and the hiring process began for the new year.  These foreign laborers worked weeks to months on the vessel to prepare it to mobilize to its first offshore location.  During this period, all work performed by foreign workers is performed on the vessel while it is docked.  Once the vessel goes offshore, they normally work four to five months at a time, and begin a regular rotation. While the vessel is working offshore, foreign laborers perform work on fixed platforms and/or drilling rigs. Foreign workers utilized by TETRA perform work on fixed installations and/or drilling rigs including welding, rigging, transporting, handling of explosives, loading and unloading of material barges, and general maintenance.

3.20    In May 2014, all foreign workers provided by Vertex were unable to work on the *TETRA Hedron* due to compliance issues.  During the brief period of noncompliance, TETRA contracted for American personnel through another contractor, C&G Welding.  While the foreign workers provided by Vertex remained idle on the vessel, American welders from C&G carried out work for TETRA.  Once the compliance issues were resolved, TETRA terminated the work of the American riggers and welders provided by C&G Welders and sent them home.  The foreign labor provided by Vertex was again used on the *TETRA Hedron* even though American workers from both C&G and Vertex existed to fill those positions.

3.21    The labor savings TETRA was able to benefit from weren't enough.  TETRA even billed Vertex for the expenses related to the American workers.  On June 18, 2014 TETRA notified Vertex that $75,000.00 would be withheld from what was due to Vertex to pay for the temporary C&G-provided American workers.

3.22    In June 2014, TETRA leased the *DB-1* from TOPPS, the company that had purchased the barge earlier in the year.  There was no exemption in place on the vessel at this point, so TETRA applied for a new exemption on June 20, 2014.  Although TETRA just a month prior had used American workers from C&G Welding during the non-compliance period on the *TETRA Hedron*, and just two days prior had actually billed Vertex for expenses related to the American workers, TETRA claimed to U.S. Coast Guard that no American workers were available for the project involving the *DB-1*.  The projected savings from using illegal workers during this project was $9,600.00 per day.  The project lasted over 90 days.

3.23    At the middle/end of 2015, TETRA approached Vertex regarding a cost reduction of foreign labor.  TETRA was informed that rates would be unable to be decreased because the cost was already so cheap and there were so many Americans available to work those positions.  Vertex continually questioned the exemption that had been granted by the Coast Guard, and informed TETRA on countless occasions that American labor existed that could fill these positions.  Every time the offer of American labor was made, TETRA rejected it.

3.24    In August 2015, TETRA was terminated from the project the *Arapaho* was working on.  On information and belief, at the time its involvement on the project ended, there were 16 American riggers and 16 American welders on board the vessel.  Of the Americans, it is believed 50% were TETRA employees with years of experience working offshore, and the other 50% were

qualified American subcontractors provided from labor companies.  The *Arapaho* returned to dock, and all the workers on the vessel were sent home.

3.25    Vertex informed TETRA that the proper course of action was to work the newly available American personnel on the *TETRA Hedron*.  There was a scheduled crew change for the foreign workers on the *TETRA Hedron* the week after the *Arapaho* returned to dock.  Approximately 20-25 foreign workers would be sent home for time-off.  With the availability of American workers, there was no need to bring over a replacement crew of foreigners.  Legally, TETRA was required to use the *Arapaho's* former American workers who were available to work.  Despite the federal laws to the contrary, TETRA decided to bring over the replacement foreign crew and ignore the widespread availability of American workers to fill these positions.  In an attempt to again save money on labor, TETRA turned a blind eye to American workers it knew were available and willing to work on its vessels.

3.26    The unfortunate reality is that someone at TETRA foresaw the likelihood that the company would try and skirt the laws regarding foreign labor.  When job positions were first created for the *TETRA Hedron* a job was created titled "rigger-trainee."  This was a position specifically created for an individual who did not have any offshore experience.  The workers hired for this position would be able to learn the job alongside more experienced personnel.  The goal was to train American workers on board the vessel and create a steady stream of American labor in order to meet manning needs without having to rely on foreign labor.  TETRA simply chose not to fill these positions in order to save money.

3.27    In December 2015, at a meeting at TETRA's The Woodlands headquarters, TETRA was informed by Vertex that American personnel could be provided to fill TETRA's labor needs on the *TETRA Hedron*.  TETRA ignored this offer of American laborers and continued to use foreign

laborers on board their vessel in the beginning of 2016.  In fact, TETRA used another labor provider to literally use the same foreign labor previously provided by Vertex on board the *TETRA Hedron*. Vertex's offer of American personnel was refused by TETRA in order to save money by using foreign workers.

3.28    By using foreign workers instead of Americans, TETRA is able to keep all American pay rates at an artificially low level and manipulate the illegal exemption to gain profits.  The use of foreign personnel on the *TETRA Hedron* allowed the company to save approximately $19,000.00 per day on that vessel alone.  TETRA is required by the exemption to continually search for American workers, but has failed to do so. By using foreign personnel, TETRA can underbid against other American companies who employ Americans as required by law.  TETRA is also able to keep TETRA's American workforce rates lower than their competition.

3.29    TETRA's improper hiring of foreign workers continues to this day. On information and belief, TETRA still uses two barges to carry out its work in the Gulf of Mexico: *the Arapaho* and the *TETRA Hedron*.  To adequately staff the two barges with riggers requires 32 workers. Despite this number, On Marcy 23, 2017 TETRA created a new job listing on the Louisiana Workforce Commission website.  TETRA advertised for only 4 positions available to American workers.  Based on TETRA's past actions it is unlikely it considers hiring any Americans for this number of positions.  To adequately satisfy the statutory requirements to establish no Americans are available to work this position, TETRA should be advertising that it has positions available for 32 riggers.

3.30    Vertex has suffered harm in the amount of depressed profits and an inability to grow the business.

11

## IV.  CAUSES OF ACTION

**A.      VIOLATIONS OF 18 U.S.C. § 1962(c) OF RICO**

TETRA IS ENGAGED IN AN ONGOING ILLEGAL WORKER HIRING SCHEME

4.1      Vertex re-alleges paragraphs 1.1 to 3.30 as though fully again set forth.

4.2      18 U.S.C. § 1962(c) provides: "It shall be unlawful for any persons employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

4.3      TETRA is a geographically diversified oil and gas services company, focused on completion fluids and associated products and services, water management, frac flowback, production well testing, offshore rig cooling, compression services and equipment and selected offshore services the provision of offshore labor to other companies.  TETRA is a global company with employees and operations on six continents.  It employs hundreds, if not thousands, of persons on its projects and has an ongoing need for workers to staff its projects.  It owns a fleet of derrick barges that it uses on its offshore projects.

4.4      TETRA prior to the filing of this lawsuit has improperly obtained foreign workers to staff its projects undertaken in the Gulf of Mexico. Despite the availability of American workers to fulfill its staffing needs, TETRA has illegally represented to the Coast Guard and the Department of Labor that there are no available American workers to fill the jobs on its offshore barges.

4.5      The Illegal Worker Hiring Scheme has been successful in reducing the personnel cost that TETRA must pay for labor.  On just the *TETRA Hedron*, the use of foreign labor has saved the company at least $19,000.00 per day, at the expense of Americans and Vertex.

4.6     Defendants are, and at all times relevant to this action, were a RICO "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

4.7     TETRA has violated 18 U.S.C. section §§ 1962 and 1962(d), and by reason of their violations, Vertex has been injured in its property.  Vertex is a victim of this illegal scheme because it was paid a wage rate for the personnel provided to TETRA below what TETRA would have been required to pay if each of the workers provided were American.

<u>THE ILLEGAL WORKER HIRING SCHEME VIOLATES RICO</u>

4.8     The Illegal Worker Hiring Scheme violates two provisions of Section 274 of the Immigration and Nationality Act, specifically, 8 U.S.C. § 1324(a)(1)(A)(iii) (knowingly harboring or concealing illegal aliens), and 8 U.S.C. § 1324(a)(3)(A) (prohibiting the knowing employment of illegal aliens).

4.9     TETRA has harbored hundreds of illegal workers by employing them on the Outer Continental Shelf ("OCS").  The employment, knowing the workers are illegally employed on the OCS, constitutes their "knowing" employment.

4.10    This pattern has repeatedly occurred during the period before this complaint was filed, and is a regular pattern and practice of TETRA's regular staffing operations.

4.11    Vertex believes that TETRA will not cease the Illegal Worker Hiring Scheme without judicial intervention.

4.12    The violations of 8 U.S.C. § 1324 are RICO violations, pursuant to 18 U.S.C. § 1961(1)(F).  The illegal worker hiring scheme violates sections 274 and 277 of the Immigration and Nationality Act, because the TETRA's acts were committed for the purpose of financial gain. Therefore, TETRA is committing a "pattern of racketeering activity" in violation of RICO.

<u>TETRA IS COMMITTING THE RACKETEERING ACTIVITY THROUGH THE
ENTERPRISE - BLUE MARINE/SEA CROSS MARINE PTE</u>

4.13    TETRA relies on offshore personnel companies like the Plaintiff to locate, train, and provide foreign labor to be used on its vessels.  The foreign labor used by TETRA during this timeframe was sourced from Blue Marine, which eventually became Sea Cross Marine PTE.  Vertex obtains workers from Blue Marine/Sea Cross Marine PTE which were then used by TETRA on an ongoing basis.  When a worker from Blue Marine/Sea Cross Marine PTE was brought to the United States by Vertex, that worker was then used by TETRA and placed on one of TETRA's offshore barges.  As shown above, most of these workers are illegal workers by virtue of the improperly obtained foreign worker exemption, which TETRA knows, and which is essential to the Illegal Worker Hiring Scheme.  Therefore, Vertex alleges TETRA is using Blue Marine/Sea Cross Marine PTE as its RICO enterprise.

4.14    Blue Marine/Sea Cross Marine is an entity formed by a nonparty that is engaged in interstate commerce. Its legitimate purpose was to provide foreign labor to fill properly obtained foreign labor exemptions.

4.15    Both TETRA and Blue Marine/Sea Cross Marine have an existence apart from the commission of the Illegal Worker Hiring Scheme, as both are legitimate businesses that perform other work.

4.16    The Defendants "person" unlawfully conducted and participated in the conduct, the management, and the operation of the Enterprise's affairs, directly or indirectly, through a pattern of unlawful activity in violation of 18 U.S.C. § 1962(c).  Defendants engaged in such unlawful conduct by using the Enterprise to conduct lawful activities as well as to further Defendants' unlawful scheme to knowingly harbor and employee illegal immigrants, causing Vertex to suffer the damages herein alleged.

14

TETRA IS COMMITTING THE RACKETEERING ACTIVITY THROUGH THE
ASSOCIATION IN FACT ENTERPRISE - ALL FOREIGN WORKERS OBTAINED
THROUGH THE ILLEGAL WORKER HIRING SCHEME

4.17    TETRA relies on foreign labor to staff its vessels.  When a worker from Blue Marine/Sea Cross Marine PTE was brought to the United States by Vertex, that worker was then used by TETRA and placed on one of TETRA's offshore barges.  As shown above, most of these workers are illegal workers by virtue of TETRA's improperly obtained foreign worker exemption, which TETRA knows, and which is essential to the Illegal Worker Hiring Scheme.  Therefore, Vertex alleges TETRA is using all foreign workers obtained through the illegal worker hiring scheme as its RICO association in fact enterprise.

4.18    The foreign workers comprised a continuing unit that functioned with a common purpose.  They were brought to the United States to fill the offshore staffing needs of TETRA, pursuant to improperly obtained foreign labor exemptions.  The purpose of the association in fact enterprise was to provide foreign labor on TETRA barges at a rate lower than would have been charged if TETRA had staffed the barges with American labor.  The foreign workers had defined roles and relationships on the barges.  TETRA used the workers for particular jobs that corresponded to identified positions on the foreign labor exemptions.  The enterprise had longevity in order to permit the workers to pursue the enterprise's purpose.

4.19    The Defendants "person" unlawfully conducted and participated in the conduct, the management, and the operation of the Enterprise's affairs, directly or indirectly, through a pattern of unlawful activity in violation of 18 U.S.C. § 1962(c).  Defendants engaged in such unlawful conduct by using the Enterprise to conduct lawful activities as well as to further Defendants' unlawful scheme to knowingly harbor and employee illegal immigrants, causing Vertex to suffer the damages herein alleged.

RICO PREDICATE ACTS: VIOLATIONS OF SECTION 247 OF THE
IMMIGRATION AND NATIONALITY ACT

4.20     The Defendants violated Section 274(a)(1)(A)(ii) of the Immigration and Nationality Act by knowingly or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transported, or moved or attempted to transport or move such alien within the United States by means of transportation or otherwise.

4.21     The Defendants violated Section 274(a)(1)(A)(iv) of the Immigration and Nationality Act by  encouraging or inducing an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law.

4.22     The Defendants violated Section 274(a)(1)(A)(v) of the Immigration and Nationality Act by conspiring to commit the violations listed in Paragraphs 4.20 and 4.21.

4.23     The Defendants participated in a plan, scheme or artifice to defraud Vertex, and with the intent to knowingly hire foreign workers, violated multiple provisions of the Immigration and Nationality Act.

4.24     As alleged more fully above, the Defendants effectuated the plan, scheme or artifice to improperly hire foreign workers, with reasonable foreseeability that the Immigration and Nationality Act would be violated, all for the purposes of gaining an improper foreign labor exemption.

4.25     Upon information and belief, Vertex will continue to identify numerous other predicate acts of violations of Section 274 of the Immigration and Nationality Act, now known only to Defendants who have proof of them in their possession.

<u>RICO PREDICATE ACTS: VIOLATIONS OF SECTION 277 OF THE
IMMIGRATION AND NATIONALITY ACT</u>

4.26    The Defendants have violated Section 277 of the Immigration and Nationality Act by knowingly aiding or assisting aliens inadmissible under Section 212(a)(3) of the Immigration and Nationality Act to enter the United States.

4.27    The foreign workers are inadmissible under Section 212(a)(3) because the foreign labor exemption granted to TETRA was improper, meaning the presence of the foreign workers in the United States violates Section 212(a)(3)(A)(ii).

4.28    The Defendants have violated Section 277 of the Immigration and Nationality Act by conniving or conspiring to allow, procure, or permit any such alien whose presence in the United States violates Section 212(a)(3) to enter the United States.

4.29    The Defendants participated in a plan, scheme or artifice to defraud Vertex, and with the intent to knowingly hire foreign workers, violated multiple provisions of the Immigration and Nationality Act.

4.30    As alleged more fully above, the Defendants effectuated the plan, scheme or artifice to improperly hire foreign workers, with reasonably foreseeability that the Immigration and Nationality Act would be violated, all for the purposes of gaining an improper foreign labor exemption.

4.31    Upon information and belief, Vertex will continue to identify numerous other predicate acts of violations of Section 277 of the Immigration and Nationality Act, now known only to Defendants who has proof of them in their possession.

<u>RICO PREDICATE ACTS: FRAUD AND MISUSE OF VISAS,</u>
<u>PERMITS, AND OTHER DOCUMENTS</u>

4.32    For the purpose of devising or intending to devise and carry out their scheme and artifice to improperly hire foreign workers, Defendants did commit a violation of 18 U.S.C. § 1546.

4.33    The information provided by Defendants in order to obtain foreign labor exemptions was misleading, inaccurate, false and/or incomplete. As a result, the foreign labor exemptions obtained by Defendants were not valid.  18 U.S.C. § 1546 prohibits the possession or obtainment of any document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained.

4.34    The surplus of American workers available to work offshore renders any statement of temporary need made by TETRA during that timeframe to be falsely made.  As such, the possession of any exemption granted by the U.S. Coast Guard violated 18 U.S.C. § 1546.

4.35    Examples of these predicate acts of misuse of immigration documents include, but are not limited to, the false claims made in TETRA's applications for foreign labor exemption. Upon information and belief, Vertex will continue to identify numerous other predicate acts of fraud and misuse of visas, permits, and other documents, now known only to Defendants who have proof of them in its possession

<u>PATTERN OF RACKETEERING ACTIVITY</u>

4.36    Defendants' previously alleged predicate acts in furtherance of its scheme to illegally hire foreign workers constituted a pattern of unlawful activity within the meaning of 18 U.S.C. § 1961(5) because the predicate acts were related and continuous.  Each predicate act had the same or similar purpose.

4.37     The Defendants were associated with the Enterprise and did conduct or participate, directly or indirectly, in the management or operation of the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5) and 1962(c), to wit: multiple violations of Section 274 of the Immigration and Nationality Act, multiple violations of Section 277 of the Immigration and Nationality Act, and multiple instances of fraud and misuse of visas in violation of 18 U.S.C. § 1546

4.38     Vertex suffered injury to its business or property as a proximate result of the pattern of unlawful activity and violations engaged in by Defendant.

<u>RELATEDNESS AND CONTINUITY OF THE UNLAWFUL ACTIVITY</u>

4.39     All of the predicate acts alleged above relate to the Defendants' unlawful acts described herein. The unlawful activity demonstrates continuity by the predicate acts alleged above, because the pattern of unlawful activity involves multiple predicate acts and related predicate acts that have taken place over several years, threatens to continue into the future indefinitely unless the Court intervenes, and constitutes the regular way of doing business by the Defendants.

4.40     As a proximate result of the pattern of unlawful activity and violations engaged in by Defendants, Vertex suffered injury to its business or property.

<u>VERTEX HAS BEEN PROXIMATELY HARMED BY TETRA'S<br>PATTERN OF RACKETEERING ACTIVITY</u>

4.41     This action is brought pursuant to 18 U.S.C. § 1962(c), which makes it illegal for TETRA to participate in the affairs of an enterprise through a pattern of racketeering activity.

4.42     TETRA participates in the affairs of an enterprise, as described, by knowingly employing hundreds, if not thousands, of illegal workers.

4.43     Vertex has been proximately harmed by the racketeering activity by being paid depressed wages by TETRA.

4.44    Vertex's injuries are direct and proximately caused by TETRA's racketeering activities.

4.45    Accordingly, Vertex has standing to sue for its damages pursuant to 18 U.S.C. 1964(c).

## V. RELIEF REQUESTED

5.1    Vertex incorporates by reference the factual allegations contained in the preceding paragraphs.

5.2    Pursuant to 18 U.S.C. § 1964(c), and as a direct and proximate result of the Defendants' wrongful conduct, Plaintiff requests treble money damages totaling: (i) the difference between the depressed amount paid Plaintiff and the actual amount Plaintiff would have received had the Defendants not hired illegal foreign workers through its pattern and practice of immigration violations in manning positions; and (ii) the reasonable and necessary attorney's fees, litigation expenses and court costs in prosecuting this action. The Plaintiff is entitled to recover such amounts.

5.3    All other relief to which Plaintiff may be entitled

## VII.  JURY DEMAND

6.1    Contemporaneous with the filing of this Original Complaint, Plaintiff has paid a jury fee and respectfully requests that the case be brought before a jury for trial on all matters.

WHEREFORE, Vertex prays for judgment against TETRA Technologies, Inc. and TETRA Applied Technologies, LLC for: actual damages; prejudgment and postjudgment interest; attorney's fees; costs of suit; and all other relief to which it may show itself justly entitled, in law or in equity.

Respectfully submitted,

**SPAGNOLETTI & CO.**

*/s/ Francis I. Spagnoletti*
Francis I. Spagnoletti
Texas SBN 18869600 / SDTX ID 5369
401 Louisiana Street, 8th Floor
Houston, TX 77002
Telephone: 713 653 5600
Facsimile: 713 653 5656
fspagnoletti@spaglaw.com

**OF COUNSEL:**

**SPAGNOLETTI & CO.**

David S. Toy
Texas SBN 24048029 / SDTX ID 588699
Eric J. Rhine
Texas SBN 24060485 / SDTX ID 1786163
401 Louisiana Street, 8th Floor
Houston, TX 77002
Telephone: 713 653 5600
Facsimile: 713 653 5656
Email: dtoy@spaglaw.com
Email: erhine@spaglaw.com

**ATTORNEYS FOR PLAINTIFF**
**VERTEX SERVICES, LLC**