IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **VERTEX SERVICES, INC.** | § | **CIVIL ACTION NO.** |
| | § | **4:17-cv-01527** |
| VS. | § | |
| | § | |
| **TETRA TECHNOLOGIES, INC., and** | § | |
| **TETRA APPLIED TECHNOLOGIES,** | § | |
| **LLC** | § | **JURY TRIAL REQUESTED** |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RELATED TO STATUTE OF LIMITATIONS

Tetra Technologies, Inc. and Tetra Applied Technologies, LLC ("TETRA" or "Defendants") ask the Court to render summary judgment against Plaintiff Vertex Services, LLC ("Vertex" or "Plaintiff") as authorized by Federal Rule of Civil Procedure 56.

### I.
### SUMMARY

Vertex asserts a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.,* flowing from TETRA's alleged misrepresentations to the United States Coast Guard ("Coast Guard") regarding the need for vessel manning exemptions and TETRA's subsequent employment of foreign workers aboard its vessels in the Gulf of Mexico pursuant to those exemptions. RICO's four-year statute of limitations, however, bars Vertex from recovery in this lawsuit. Because Vertex knew of its alleged injuries in 2012,

this lawsuit filed in 2017 is untimely. Further, the "separate accrual" rule does not extend the limitations period because Vertex knew of the alleged fraud.

## II.
## STATEMENT OF FACTS

TETRA provided vessel based construction and decommissioning services for the offshore oil and gas industry in the Gulf of Mexico. Vertex filed this civil RICO lawsuit against TETRA on May 18, 2017. Dkt. 1. Vertex alleges that from 2012 to today, TETRA has made misrepresentations to the Coast Guard about the need for vessel manning exemptions. Dkt. 30 (FAC) at ¶ 4.59. Vertex claims that it was injured by these representations by suffering depressed profits. Dkt. 30, FAC at ¶ 3.30.

**A. In Some Circumstances, Federal Law Allows for the Employment of Foreign Workers on Vessels Engaged in OCS Activities**

Federal law requires that all vessels engaged in Outer Continental Shelf ("OCS") activities, including the exploration, development, or production of oil and gas, be manned by U.S. citizens or lawfully admitted permanent residents. 43 U.S.C. § 1356(a)(3); 33 C.F.R. § 141.1. When there are insufficient numbers of U.S. citizens or lawfully admitted permanent residents qualified and available for such work, the regulation allow for exceptions to this U.S. citizen requirement. 43 U.S.C. § 1356(c)(1)(B). Federal regulations set out the requirements for requests seeking a vessel manning exemption for this reason, including that they must be in

2

writing, directed to the Coast Guard, and the Coast Guard must seek information from the Department of Labor regarding whether there are adequate numbers of U.S. citizens or lawfully admitted permanent residents qualified and available for work. 33 C.F.R. § 141.20. The Coast Guard has issued detailed guidance regarding seeking such an exemption. Navigation and Vessel Inspection Circular ("NVIC") 7-84 (https://www.dco.uscg.mil/Portals/9/DCO%20Documents/5p/5ps/ NVIC/ 1984/n7-84.pdf).

### B. TETRA Sought and Obtained Vessel Manning Exemptions from the Coast Guard

TETRA has obtained vessel manning exemptions from the Coast Guard for many years. Ex. 5 (*Hedron*, 2012-13), Ex. 6 (*Hedron*, 2011-12), Ex. 7 (*Hedron*, 2013-14), Ex. 8 (*Hedron*, 2014-15), Ex. 9 (*Hedron* 2015-16), Ex. 10 (*DB-1*, 2011-12), Ex. 11 (*DB-1*, 2014-15). By way of example, in TETRA's 2012 request or application for exemption for the *Hedron* crane barge, TETRA explained its inability to fill the positions on the foreign-flagged barge with qualified and available U.S. citizens or permanent resident aliens, especially in light of the requirement that it staff its other U.S. flagged barges with U.S. citizens. Ex. 3 at p. 1. TETRA supported the application with over forty pages of supporting evidence, including newspaper advertisements seeking employees and a log of applicants. Ex. 3. The Coast Guard first granted a ninety-day temporary exemption. Ex. 4. It

3

later granted a permanent one-year exemption, valid from September 14, 2012 to September 14, 2013, stating:

> My decision to certify this exemption is based, in part, on a determination made by the Department of Labor, Employment and Training Administration, Office of Foreign Labor Certification, that there are not a sufficient number of citizens of the United States or resident aliens qualified and available for the work needed to be performed.

Ex. 5.

### C. Jason Green Assisted TETRA in Obtaining Vessel Manning Exemptions from 2007 through 2011

Jason Green worked for TETRA from October 2006 to May 2012. Ex. 1, Green depo. at pp. 10:3-5 (began in October 2006), 62:24 to 63:3 (ended in May 2012). He assisted TETRA in obtaining the vessel manning exemptions from the Coast Guard from 2007 through 2011. Ex. 1, Green depo. at pp. 39:19 to 41:7. When he assisted TETRA with obtaining exemptions, Green claims there was a bona fide need because there were not enough Americans to fill the positions. Ex. 1, Green depo. at pp. 62:13 to 63:3; 80:7 to 81:22. After Hurricane Katrina in 2005, there were not enough available and qualified Americans to work on the OCS. Ex. 1, Green depo. at pp. 34:21 to 35:11. Additionally, after the *Deepwater Horizon* spill in 2010, American labor was difficult to find because much of it was diverted to helping with the clean-up in the Gulf of Mexico. Ex. 1, Green depo. at pp. 52:4 to 53:12, 62:13 to 63:3.

4

D.     **Vertex Services Supplied Labor to TETRA Beginning in 2009**

Vertex was a personnel placement company that began providing American labor to TETRA in 2009. Ex. 2, Rutledge depo. at p. 25:3-7. Around 2010 or 2011, it also began supply foreign labor to TETRA. Ex. 2, Rutledge depo. at p. 25:3-12. Beginning in April 2011, Greg Rutledge headed Vertex. Ex. 2, Rutledge depo. at pp. 9:18 to 10:1.

Every year that TETRA obtained its vessel manning exemptions from the Coast Guard, it would forward the exemptions to Vertex. Ex. 2, Rutledge depo. at p. 39:4-12. Rutledge testified that he reviewed the exemptions and forwarded them to Jimmy Ho, his foreign labor provider, in order to obtain the necessary visas for the foreign workers. Ex. 2, Rutledge depo. at pp. 39:4-12, 89:6-13.

E.     **Jason Green Left TETRA in May 2012 and Began Work for Vertex**

Jason Green left TETRA in May 2012 and began working for Vertex in June or July 2012. Ex. 1, Green depo. at pp. 62:24 to 63:3, 89:22-24. Although Greg Rutledge headed the company, Jason Green was Vertex's person in charge of placing foreign and American personnel aboard TETRA's barges. Ex. 2, Rutledge depo. at pp. 9:18 to 10:1 (sole owner of company since April 2011); Ex. 1, Green depo. at p. 98:10-14.

**F.     As Early as 2012, Vertex Knew that TETRA Allegedly Made Misrepresentations to the Coast Guard to Obtain Exemptions**

At deposition, Jason Green made clear that while he assisted with TETRA's applications for exemption from 2007 to 2011, TETRA did not make any misrepresentations about the lack of qualified American labor.  Ex. 1, Green depo. at pp. 62:13-23, 66:6-10, 71:11 to 72:8.  In 2012, however, after he had departed TETRA and began working for Vertex, Green alleges that TETRA misrepresented to the Coast Guard the state of the employment market and the availability of qualified American labor.  Ex. 1, Green depo. at pp. 66:6-19, 184:4-22.  According to Green, there were sufficient numbers of qualified and available American workers to fill the positions aboard TETRA's barges in 2012.  Ex. 1, Green depo. at pp. 90:6 to 92:1, 100:23 to 101:14.  He testified:

> Q.     And you feel confident that there were enough American workers in the end of 2012 that were qualified to do work for -- on all of TETRA's barges?
>
> A.     I think by the end of the year, they could have hired as many as they wanted to.

Ex. 1, Green depo at pp. 91:1-5.  He knew this, in part, because he was allegedly able to successfully recruit a large number of qualified, American workers for an unsubstantiated job for another unspecified client in the summer of 2012.  Ex. 1, Green depo. at pp. 66:6 to 67:6, 88:24 to 90:5.  Green explained:

6

> Q. Do you think that TETRA broke the law or committed any sort of misrepresentation when it submitted applications for exemptions to the Coast Guard at any point in time?
>
> A. After I left.
>
> Q. Okay. And that would be 2012 -- what years do you think that happened?
>
> A. In 2012, when I left -- I left in May. By July, I had a whole other contract with somebody else. I was supplying the whole barge, riggers, welders, everything.
>
> Q. For another company?
>
> A. For another company, and it was all Americans. I was crewing the whole barge in Americans.

Ex. 1, Green depo. at pp. 66:6-19.

Rutledge also believes that TETRA made misrepresentations to the Coast Guard concerning the availability of sufficient qualified Americans to crew TETRA's barges in 2012. Ex. 2, Rutledge depo. at p. 73:7-21. He testified:

> Q. What date do you think TETRA should have been able to completely crew its foreign vessels with American labor?
>
> A. I'd say the middle of 2012, whenever it went to work.
>
> Q. Whenever the vessels went to work?
>
> A. Uh-huh.
>
> Q. Is that a "yes"?
>
> A. Yes.

> Q. So from mid 2012 forward, you think there were qualified, available American workers to hire to work as riggers, welders –
>
> A. Most definitely.
>
> Q. -- mechanics?
>
> A. Most definitely.

Ex. 2, Rutledge depo. at p. 73:7-21. He agrees with Green that TETRA began misrepresenting same to the Coast Guard in 2012. Ex. 2, Rutledge depo. at p. 81:12-15.

Rutledge reviewed TETRA's manning exemptions each year and knew that the Coast Guard's exemption was based on the determination that there were "not a sufficient number of citizens of the United States or resident aliens qualified and available for the work needed to be performed." Ex. 2, Rutledge depo. at pp. 39:4-12, 89:6-13; Ex. 5 (*Hedron*, 2012-13), Ex. 6 (*Hedron*, 2011-12), Ex. 7 (*Hedron*, 2013-14), Ex. 10 (*DB-1*, 2011-12).[1] When Rutledge received and read the vessel manning exemptions each year, he clearly knew about TETRA's alleged representations regarding the availability of qualified American workers.

With knowledge of the alleged fraud beginning in 2012, however, Vertex continued to profit from the provision of foreign labor to TETRA. Vertex believed

---

[1] Later exemptions contain similar language. Ex. 8 (*Hedron*, 2014-15), Ex. 9 (*Hedron* 2015-16), Ex. 11 (*DB-1*, 2014-15).

8

that providing the foreign labor to TETRA was the only way it would be allowed to provide American labor to TETRA. Ex. 2, Rutledge depo. at pp. 81:20 to 82:12.

**G.  Vertex Knew at All Times that it was Injured by TETRA's Alleged Use of Foreign Labor**

Vertex's desire to continue providing American labor to TETRA, in spite of allegations that TETRA was defrauding the federal government, resulted from the much higher profit Vertex made on the provision of American workers. That is, for every foreign worker it provided to TETRA, it lost the opportunity to provide an American worker on which it would make a much higher profit. It was not until Vertex lost the TETRA contract that it filed this lawsuit complaining about TETRA's alleged misrepresentations.

Jason Green knew all along that a personnel services company like Vertex makes more profit on an American worker than on a foreign worker. Ex. 1, Green depo. at pp. 105:1 to 107:13. Green testified that Vertex made $19 per hour profit providing an American rigger to TETRA, but only $12 per day profit providing a foreign rigger to TETRA. Ex. 1, Green depo. at pp. 103:18 to 104:2. He knew about this disparity in profit the moment he arrived at Vertex in 2012. Ex. 1, Green depo. at pp. 106:18 to 107:13.

Indeed, Vertex's written production confirms that Vertex lost money by providing foreign laborers in place of American laborers. In January 2013, Jimmy Ho provided a foreign rigger to Vertex for $87 per twelve-hour work day. Vertex

9

then charged TETRA "cost plus 14%" or $99.18 per day for that foreign rigger's twelve hours. This generated a profit to Vertex of **$12.18 per day on a foreign rigger**. Ex. 12, Vertex invoice no. 130004.

During that same period, Vertex paid its American riggers from $10 to $15 per hour (time and a half overtime) or $140 to $210 for a twelve-hour work day. Vertex then charged TETRA $34 per regular hour and $41.50 per overtime hour for that American rigger's twelve-hour work day, totaling $438. This generated a profit to Vertex of **$228 to $298 per day on an American rigger**. Ex. 13, Vertex spreadsheet for provision of American labor aboard the *Arapaho* in 2013.

Thus, in the exemplar case of riggers in 2013, by providing a foreign worker, as opposed to an American one, Vertex lost between $215 and $285 per day per rigger.

### III.
### SUMMARY JUDGMENT EVIDENCE

In support of its motion, TETRA includes the following evidence which it incorporates by reference:

    Exhibit 1    Deposition of Jason Green, May 17, 2019;

    Exhibit 2    Deposition of Greg Rutledge, May 24, 2019;

    Exhibit 3    Exemption Request for *Hedron*, Aug. 16, 2012;

    Exhibit 4    Temporary Exemption for *Hedron*, Sept. to Dec. 2012;

    Exhibit 5    Permanent Exemption for *Hedron*, Sept. 2012 to 2013;

| | |
|---|---|
| Exhibit 6 | Permanent Exemption for *Hedron*, Aug. 2011 to 2012; |
| Exhibit 7 | Permanent Exemption for *Hedron*, Sept. 2013 to 2014; |
| Exhibit 8 | Permanent Exemption for *Hedron*, Sept. 2014 to 2015; |
| Exhibit 9 | Permanent Exemption for *Hedron*, Sept. 2015 to 2016; |
| Exhibit 10 | Permanent Exemption for *DB-1*, Oct. 2011 to 2012; |
| Exhibit 11 | Permanent Exemption for *DB-1*, June 2014 to 2015; |
| Exhibit 12 | Vertex invoice no. 130004 dated Jan. 15, 2013; and |
| Exhibit 13 | Vertex spreadsheet for provision of American labor aboard the *Arapaho* in 2013. |

## IV.
## STANDARD OF REVIEW

Summary judgment is proper in a case in which there is no genuine dispute of material fact. Fed. R. Civ. P. 56(a); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A defendant who seeks summary judgment on a plaintiff's claim must demonstrate the absence of a genuine dispute of material fact by either (1) submitting summary-judgment evidence that negates the existence of a material element of the plaintiff's claim or (2) showing there is no evidence to support an essential element of the plaintiff's claim. *J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996); *see Celotex Corp.*, 477 U.S. at 322-23. Summary judgment is mandatory "against a party who fails to make a showing sufficient to

11

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 766 (5th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## V.
## ARGUMENT

RICO's four-year statute of limitations bars Vertex from recovery in this lawsuit filed on May 18, 2017.

### A. The RICO Statute of Limitations is Four Years from Discovery of Injury

The United States Supreme Court has adopted a four-year limitations period for all civil RICO actions. *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 156 (1987). The limitations period commences when the injured party discovers, or should have discovered, an injury. *Rotella v. Wood*, 528 U.S. 549, 558-59 (2000).

### B. Vertex's 2017 Lawsuit is Time Barred because its 2012 Injury Began the Running of the Limitations Period

It is undisputed that Vertex knew of its alleged injury as early as 2012. Vertex was aware at all times that it made less profit every time it provided a foreign worker in a position where it could have provided an American worker. Jason Green testified:

12

Q. When did you first realize that, that Vertex was making more profit off American workers than foreign workers?

A. What do you mean when did I realize it? Everybody in the world knew that. It's not rocket science. You're paying less than minimum wage. Do you realize that at the fourteen percent, that's not even minimum wage a day. We had -- I at Vertex -- I mean at TETRA had to raise Jimmy's rate so that we would even be paying minimum wage because they weren't even going to get minimum wage at that price.

Q. So in 2012, when you started working at Vertex, you knew right off the bat that Vertex made more money on a per-worker basis off American workers than they did off foreign workers?

A. I mean, I've known that since 2001 when I was at Horizon. I mean, when I was clerking in 2001, you knew way back then, even when the American workers weren't making no money. It wasn't hard. How do you think the foreign guys -- I mean, everybody on the barge knows the foreign guy is making $40 a day, man. That's what he makes.

Q. My question -- I want to make sure we're on the same page here. That's all.

A. Yeah. We're going to go back to '01. Yeah, I've always known that American workers make more than foreign workers.

Q. That's not what I'm asking you, though. My question was this, and just listen and make sure I give you a good question you can answer. In 2012, when you went to Vertex, I'm talking about the amount of profit that Vertex makes off of the workers. You knew that -- let me finish. You knew that Vertex made more profit by providing TETRA American workers than with providing TETRA foreign workers, right, on a per-worker basis?

A. It was the same way I knew Curtis was making more money off the Americans than he was off the foreigners when Curtis had the contract all the way up until 2010. It's the same difference.

13

> Q. Simple question.
>
> A. It's a simple answer.
>
> Q. When you joined Vertex in 2012, you knew that Vertex was making more profit off of providing American workers to TETRA –
>
> A. I'm going to give you the same answer.
>
> Q. -- than with foreign workers to TETRA on a per-worker basis?
>
> A. I'm going to give you the same answer. You want me to keep giving you the answer. Like I told you last time, we can go back and forth. Me personally, I would love to go sit in front of a Court and judge and do this.
>
> Q. Can you give me a "yes" or "no" answer on that?
>
> A. Of course. The answer is yes, but you're making it seem like I just knew that in '12, though.

Ex. 1, Green depo. at pp. 105:1 to 107:6. Because Vertex knew of its injury in 2012, it filed this 2017 lawsuit outside the statute of limitations.

**C.  The "Separate Accrual" Rule Does Not Save Vertex's Claim Because Vertex Proceeded with Knowledge of the Alleged Fraud**

The Fifth Circuit has carved out a limited exception to the rule that limitations runs from discovery of injury, but it does not apply here.

**1.  The "separate accrual" rule applies where there is a series of similar, independent injuries**.

The Fifth Circuit has followed the Second Circuit in adopting a "separate accrual" rule for some RICO violations. In *Love*, the RICO defendant repeatedly

14

submitted false insurance claims to the plaintiff insurance carrier. The separate injuries occurred from 1992 to 1995, before the carrier discovered the defendants' injurious scheme in 1995. *Id*. at 768-69, 778. The carrier intervened in a lawsuit in February 1996. *Id*. at 770. On appeal, the carrier argued that the scheme to defraud was "a 'continuing violation' with a new and independent claim accruing with each submittal of an allegedly fraudulent insurance claim in furtherance of that scheme." *Id*. at 772. The court adopted the Second Circuit's "separate accrual" rule which "allows a civil RICO claim to accrue for each injury when the plaintiff discovers, or should have discovered, that injury." *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 773-75 (5th Cir. 2000).

### 2. *Love's* "separate accrual" rule does not apply where a RICO plaintiff knows of the underlying fraud.

*Love's* "separate accrual" rule, however, is not universally applicable. The Fifth Circuit has recognized that "[t]he 'separate accrual' rule . . . does not apply where a plaintiff already knows or should know of the fraud." *DeShazo v. Nations Energy Co. Ltd.*, 286 Fed. Appx. 110, 117 (5th Cir. 2008). In *DeShazo*, the shareholder plaintiff alleged that the defendants misled him about the financial health of his company, making his interest in the company seem less valuable, and inducing him to sell his shares to defendants at an unfairly low price in 1999 and 2001. *Id*. at 111. The plaintiff filed his RICO action in 2005. *Id*. at 112. He

15

argued that the 2001 sale was a separate injury and thus a separate RICO cause of action for purposes of the limitations period. *Id*. at 117.

The *DeShazo* court noted that in *Love*, there was <u>no evidence</u> that the plaintiff insurance carrier "was aware of any fraudulent conduct until the end of a series of violations that occurred over three years." *Id*. at 118 (citing *Love*, 230 F.3d at 778). Whereas, in February 2000, Mr. DeShazo had received a memo detailing concerns regarding the scheme. *Id*. at 111. Thus, "DeShazo was or should have been aware of the fraudulent scheme in February 2000, yet he continued to rely on Defendants' fraudulent representations." *Id*. at 118.

Similarly, the Fifth Circuit has affirmed a district court's refusal to apply *Love's* "separate accrual" rule where a plaintiff suffered additional injuries because he continued to rely on a fraud that he should have already discovered. *Prieto v. John Hancock Mut. Life Ins. Co.*, 132 F. Supp. 2d 506, 524 (N.D. Tex. 2001), aff'd, 35 Fed. Appx. 390 (5th Cir. 2002). In the *Prieto* matter, investor Brett Davis purchased a $10 million whole life insurance policy in 1983. *Id*. at 510. He allegedly made the purchase and continued to pay annual premiums based on misrepresentations made by his insurance agent in 1983 and thereafter. *Id*. 511. The plaintiff withdrew from a federal class action lawsuit filed in 1995 and filed his RICO action in 1997. *Id*. at 511. The court found that the plaintiffs knew of the alleged fraud by no later than 1987. *Id*. at 521. In Davis' deposition, he

16

testified that he received and reviewed the policy in 1987 and determined that many of the representations made by his agent were false. *Id*. at 521. The district court held that even if each premium payment constituted a separate injury under the "separate accrual" rule, "such premium payments came well after 1987, when the court concludes Plaintiffs were or should have been aware of the alleged fraud." *Id*. at 524. Thus, the court granted summary judgment on limitations. *Id*. at 524-25.

### 3. Vertex's knowledge of TETRA's alleged misrepresentations to the Coast Guard 2012 prevents it from utilizing *Love's* "separate accrual" rule.

Because Vertex knew or had reason to know of TETRA's alleged "illegal hiring scheme" for four years before filing suit, the "separate accrual" rule cannot save any injuries (i.e., lost profits) that Vertex may have suffered later.

Jason Green knew in 2012 that TETRA was allegedly misrepresenting to the Coast Guard that it could not find qualified and available American workers to fill positions on its foreign-flagged barges. He knew this because he had been involved in TETRA's exemption application process from 2007 through 2011 before he left TETRA in 2012. Ex. 1, Green depo. at pp. 39:19 to 41:7. He also knew this because he was allegedly able to find qualified and available Americans to crew another client's barge in 2012. Ex. 1, Green depo. at pp. 66:6 to 67:6, 88:24 to 90:5.

17

Greg Rutledge also had reason to know that TETRA was making alleged misrepresentations to the Coast Guard in 2012. He reviewed the vessel manning exemptions each year before forwarding them to his foreign labor provider for use in obtaining the proper visas for the foreign workers. Ex. 2, Rutledge depo. at pp. 39:4-12, 89:6-13. The 2012[2] exemption provided information allowing him to determine the substantive reason the Coast Guard was allowing TETRA to use foreign workers aboard its barges. It states:

> This letter serves as a certification of the exemption, and is valid for 1 year in accordance with 33 CFR § 141.20(f) to expire September 14, 2013.

Ex. 6. It further states:

> My decision to certify this exemption is based, in part, on a determination made by the Department of Labor, Employment and Training Administration, Office of Foreign Labor Certification, that there are not a sufficient number of citizens of the United States or resident aliens qualified and available for the work needed to be performed.

Ex. 6.

Because Vertex knew in 2012 everything it now rests its claims on, its claims are barred by the statute of limitations.

---

[2] All other exemptions include the same or similar language. Ex. 5 (*Hedron*, 2012-13), Ex. 6 (*Hedron*, 2011-12), Ex. 7 (*Hedron*, 2013-14), Ex. 8 (*Hedron*, 2014-15), Ex. 9 (*Hedron* 2015-16), Ex. 10 (*DB-1*, 2011-12), Ex. 11 (*DB-1*, 2014-15).

# VI.
# CONCLUSION

For these reasons, TETRA asks the Court to grant this motion and render final summary judgment in TETRA's favor.

        Respectfully submitted,

        */s/ Glenn R. Legge*
        **Glenn R. Legge**
        TBA 12171330
        Fed. ID 5420
        5151 San Felipe, Suite 400
        Houston, Texas 77056
        Telephone No.:   (713) 917-0888
        Facsimile No.:   (713) 953-9470
        **ATTORNEY FOR DEFENDANTS TETRA TECHNOLOGIES, INC. AND TETRA APPLIED TECHNOLOGIES, LLC**

OF COUNSEL:
**HOLMAN FENWICK WILLAN USA LLP**
Jeanie Tate Goodwin
TBA: 24046949  Fed ID: 592456
Jeanie.Goodwin@hfw.com
Sheshe Taylor Evans
TBA: 24047800  Fed ID: 37745
Sheshe.Evans@hfw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy was served via ECF on this 6th day of September 2019 to:

Francis I. Spagnoletti
401 Louisiana, 8th Floor
Houston, Texas 77002
Telephone: (713) 653-5600
Facsimile:  (713) 653-5656
Email: fpagnoletti@spaglaw.com

>                   */s/ Glenn R. Legge*
>                   *Glenn R. Legge*