IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **VERTEX SERVICES, INC.** | § | CIVIL ACTION NO. |
| | § | 4:17-cv-01527 |
| VS. | § | |
| | § | |
| **TETRATECHNOLOGIES, INC., and** | § | |
| **TETRAAPPLIED TECHNOLOGIES,** | § | |
| **LLC** | § | **JURY TRIAL REQUESTED** |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
RELATED TO PLAINTIFF'S FAILURE TO EXHAUST
<u>ADMINISTRATIVE REMEDIES</u>**

TETRA Technologies, Inc. and TETRA Applied Technologies, LLC ("TETRA" or "Defendants") ask the Court to render summary judgment against Plaintiff Vertex Services, LLC ("Vertex" or "Plaintiff") as authorized by Federal Rule of Civil Procedure 56, and show as follows:

**I.
<u>SUMMARY</u>**

Vertex filed this lawsuit alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, stemming TETRA's alleged misrepresentations to the United States Coast Guard ("Coast Guard") to obtain vessel manning citizenship exemptions under 43 U.S.C. §1356 and 46 U.S.C. §8103, and TETRA's subsequent employment of foreign workers aboard its vessels in the Gulf of Mexico pursuant to those exemptions. Plaintiff's repeated failure to exhaust its administrative remedies, however, bar it from bringing this lawsuit. Because Plaintiff failed to act at the administrative level to

remedy the alleged inappropriate exemptions, it cannot now ask this Court to review, reevaluate, and overturn more than four (4) years' worth of Coast Guard granted exemptions (2012 to 2015) some eight (8) years after the fact. The Coast Guard and the U.S. Department of Labor (DOL) are the agencies to which Plaintiff should have addressed its complaints during the pendency of the exemptions, which have long expired.

In order for Plaintiff to prevail on its claims, it must prove that the 46 U.S.C. § 8103 and 43 U.S.C. § 1356 exemptions granted by the Coast Guard were unlawfully issued. Therefore, Plaintiff asks this Court to conduct a *de novo* review of the Coast Guard/DOL methodologies and analyses that were used in determining whether the exemptions should have been granted. Essentially, Plaintiff wants this Court to overturn the decisions and determinations made by the Coast Guard/DOL dating back to 2012 on mere speculative and self-serving allegations that Plaintiff could have provided qualified American workers to TETRA.

Despite Plaintiff's unsubstantiated allegations, there is no evidence in the record establishing that the Coast Guard/DOL breached their obligations to conduct independent investigations of the labor market existing when the exemptions were requested, as required by 43 U.S.C. § 8103 and the USCG Navigation and Vessel Inspection Circular ("NVIC") No. 7-84[1], and 33 CFR §

---

[1] Exhibit 1.

141. Nevertheless, Plaintiff would have this Court conduct its own investigation of the labor market dating back to 2012 and find the USCG's/DOL's determinations unlawful and set aside the waivers received by TETRA from 2012 to present. It is of critical importance that knowing the assertions made by TETRA and the findings of the Coast Guard/DOL, Plaintiff never notified the Coast Guard/DOL that their determinations were erroneous or timely filed a citizen suit under 43 U.S.C § 1349, against the Coast Guard/DOL alleging it was adversely affected by their determinations. Therefore, Plaintiff's claims are barred as it failed to exhaust its administrative remedies pursuant to 43 U.S.C. § 1349(a).

## II.
## FACTUAL BACKGROUND

Vertex was a for-profit middleman in what it now calls the "Illegal Worker Hiring Scheme" ("IWHS"). As admitted by Plaintiff in its First Amended Complaint (Dkt. No. 30), the alleged IWHS could not have functioned without it:

> 3.4 Vertex was a major source of offshore labor for TETRA…. In addition to providing American labor for manning requirements, Vertex also provides foreign labor with B-1 OCS visas when a company has received a U.S. Coast Guard exemption regarding foreign personnel.
>
> 3.20 In May 2014, all foreign workers provided by Vertex were unable to work on the *TETRA Hedron* due to compliance issues.…
>
> 4.15 TETRA relies on offshore personnel companies like the Plaintiff to locate, train, and provide foreign labor to be used on its vessels…. When a worker from Blue Marine/Sea Cross Marine PTE was brought to the United States by Vertex, that worker was

then used by TETRA and placed on one of TETRA's offshore barges….

4.24 TETRA relies on foreign labor to staff its vessels. When a worker from Blue Marine/Sea Cross Marine PTE was brought to the United States by Vertex, that worker was then used by TETRA and placed on one of TETRA's offshore barges….

4.26 The association-in-fact enterprise has longevity because it existed for several years from 2012 and continues to this day.

4.47 Association in fact enterprise member Vertex obtains workers from association in fact enterprise member Blue Marine/Sea Cross Marine PTE which were then used by TETR Aon an ongoing basis. When a worker from Blue Marine/Sea Cross Marine PTE was brought to the United States by Vertex, that worker was then used by TETRA and placed on one of TETRA's offshore barges.

4.50 The Blue Marine/Sea Cross PTE and Vertex Association In Fact Enterprise shares a commonality of purpose to provide TETRA foreign labor to be used on its vessels; the association in fact enterprise functions as a continuing unit to provide TETRA foreign labor to be used on its vessels….

4.78 During ongoing 12-month periods beginning in 2012, Vertex knowingly hired for employment at least 10 individuals with actual knowledge that these individuals were aliens who, absent their visas that had been obtained under false pretenses or misrepresentations, were not lawfully authorized to work within the U.S. or on the OCS.

As predicate acts for its RICO claims, Vertex alleges that TETRA used foreign labor that was brought to the United States "under the color of visas that were obtained in relation to foreign labor waivers Defendant obtained from the United States Coast Guard under false pretenses and/or misrepresentations about the supposed shortage of American workers available to work offshore." Dkt. No. 30, ¶ 4.58. Therefore, in order to sustain its claims, Plaintiff must prove, and

the Court must find, that the actions by the Coast Guard/DOL were unlawful and set aside the waivers received by TETRA dating back to 2012.

Plaintiff's allegations are also significant in relation to what they ***do not*** allege or attempt to establish.  Throughout the Plaintiff's 52 page Amended Complaint, Vertex never alleges that the Coast Guard or the DOL failed to meet their obligations of conducting an independent investigation to determine whether TETRA applications for the citizenship waivers were accurate as required by 46 U.S.C. § 8103(b)(3)(C) and NVIC No. 7-84.

The Outer Continental Shelf Lands Act (hereinafter the "Act") directs, that with specific exceptions, all units operating on the Outer Continental Shelf (OCS) must employ American citizens or residents aliens.  *See* NVIC No. 7-84; 43 USC § 1356.  The requirement that any vessel, rig, platform, or other vehicles subject to the Act be manned or crewed by citizens of the U.S. or residents aliens can be waived if "there are not a sufficient number of" U.S. citizens or resident aliens "qualified and available for such work".  *See* 43 U.S.C. § 1356(c)(1)(B).  The Coast Guard issued regulations regarding the manning requirements and the allowed exceptions to the all-American mandate.  *See* 33 CFR § 140.  As it relates to this case, the Coast Guard regulations specify that an employer may request an exemption when there is not a sufficient number of citizens or resident aliens "qualified and available" for the work by submitting the following information:

- A detailed job description, with list of qualifications, for each position requiring a waiver.

5

- In reviewing qualifications required for the positions where there is an obvious seniority relationship, the listed experience factors should reflect this.

- Documented proof of attempts to find employees through normal private sources including advertisements in widely circulated newspapers for at least three days; advertising in at least one edition of a large mineral and oil industry trade magazine and proof of correspondence with maritime and/or oil industry related employment agencies and other appropriate suppliers of workers. Included should be, by position, a summation of numbers of applications received, numbers of interviews granted, numbers hired, and reasons workers not qualified. A description of the owner/operators training program should be submitted to show their intended efforts to train U.S. citizens for employment on the Shelf.

Exhibit 1, NVIC No. 7-84(4)(b)(1)(a). Paragraph 4 of the NVIC No. 7-84, further states, in its pertinent parts:

a. All owner/operators who believe their unit is eligible for the exemptions mentioned in 3a(l)(2) and (4), must submit the necessary information to the Commandant (G-MVP) in order for a determination to be made. No unit will be granted an exemption until it has been demonstrated to the Commandant's satisfaction that the unit is indeed eligible for exemption from the citizenship requirements.

b. For all owner/operators who believe they qualify for the exemption from the citizenship requirements … the following procedures are to be followed to obtain exemptions ….
….

2) The Coast Guard will, upon receipt of this information, decide if the exemption is needed and if recruitment via the private sector was actively pursued. In the event that this information is judged insufficient, the owner/operator will be contacted for any additional material.

3) If it is determined that the provided information is adequate, then this material will be forwarded to Department of Labor (DOL).

6

    4) DOL will then review all the information they have received and determine if any qualified U.S. workers are available. If there are none, the Coast Guard will be notified, pursue the matter no further and issue the exemption. However, if DOL locates prospective employees, the Coast Guard will forward to the employer the name of the State Employment Service where the worker(s) can be found.
….

    9) Waivers are issued for one year periods and must be reapplied for at the end of that year….

The granting of an exemption is a final decision of the Commandant of the USCG.

Since at least 2011, TETRA was in need of workers for its vessels. Not finding enough "qualified and available" American seaman, it sought citizenship exemptions pursuant to NVIC No. 7-84. Finding that TETRA had met its obligations and requirements under Paragraph 4 of the NVIC No. 7-84, the Coast Guard and DOL approved the citizenship exemptions. *See* Exhibit 2 (Coast Guard exemption approvals from 2011 to 2015). It should be noted, that other owners/operators throughout the United States also sought and were granted citizenship exemptions during the same time that TETRA was seeking, and was granted, the exemptions. The exemption approvals received from the Coast Guard clearly state they are based on a finding that "there are not a sufficient number of citizens of the United States or resident aliens qualified and available for the work needed to be performed." *See* Exhibit 2.

Upon receipt of the Coast Guard approvals, TETRA would provide them to Plaintiff. Gregory Rutledge, the sole owner of Vertex, testified that he would read each exemption received from Tetra. Exhibit 3, Deposition of Rutledge, p. 89:6-13. After receiving the Coast Guard exemption approvals, Plaintiff simply continued to "locate, train, and provide foreign labor to be used on [TETRA's] vessels", Dkt. No. 30, ¶ 4.15, and continued to profit from said service provided to TETRA year (2011), after year (2012), after year (2013), after year (2014), after year (2015). It is undisputed that, at no time after receiving the USCG approvals, did Plaintiff notify the USCG or DOL that their determinations were erroneous and that Plaintiff did in fact have a "surplus" of "qualified and available" American workers to fill the positions needed by Tetra. It was not until two (2) years after losing its contract with TETRA (its contract was terminated in 2015), and long past the expiration of the USCG exceptions in question, that Plaintiff filed an action alleging that the exemptions were not valid.

### III.
### STANDARD OF REVIEW

Summary judgment is proper in a case in which there is no genuine dispute of material fact. Fed. R. Civ. P. 56(a); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A defendant who seeks summary judgment on a plaintiff's claim must demonstrate the absence of a genuine dispute of material fact by either (1) submitting summary-judgment evidence that negates the existence of a material element of the plaintiff's claim

8

or (2) showing there is no evidence to support an essential element of the plaintiff's claim. *J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996); *see Celotex Corp.*, 477 U.S. at 322-23. Summary judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 766 (5th Cir. 2011) (quoting Celotex Corp., 477 U.S. at 322).

## IV.
## ARGUMENT

**A.    Plaintiff's Claims are Barred for Failure to Exhaust Plaintiff's Administrative Remedies**

Judicial review of a final determination by the Coast Guard "Commandant or that person's delegate pursuant to the [Outer Continental Shelf Lands] Act or the regulations in this subchapter, is governed by the judicial review provisions of Section 23 of the Act (43 U.S.C. § 1349)." 33 CFR § 140.30(b). The judicial review provisions of the Act state, in part, that "any person having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this subchapter against any person… for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter". 43 U.S.C. § 1349(a)(1). However, "no action may be commenced under subsection (a)(1) of this section--***prior to sixty***

9

***days after the plaintiff has given notice of the alleged violation, in writing under oath,*** **to the Secretary and any other appropriate Federal official,** to the State in which the violation allegedly occurred or is occurring, ***and to any alleged violator***". *Id*. at 1349(a)(2)(A) (emphasis added).  Furthermore, "***all suits challenging actions or decisions allegedly in violation of***, or seeking enforcement of, ***the provisions of this subchapter, or any regulation promulgated under this subchapter*** … ***shall be undertaken in accordance with the procedures described in this subsection***." *Id*. at 1349(a)(6) (emphasis added). Therefore, an aggrieved person must exhaust his/her administrative remedies prior to commencing a suit seeking to compel compliance with the Act, which includes the granting of the citizenship exemptions.

In this case, Plaintiff failed to comply with 43 U.S.C. 1349(a)(2)(A), by not giving notice, under oath (or in any other way), to the Commandant of the USCG, or the alleged violator, regarding the alleged violation of the Act when the USCG granted TETRA the citizenship exemptions.  In fact, there is no evidence on record of Plaintiff ever communicating to the USCG or the DOL regarding the alleged "surplus" of American maritime labor which were "qualified and available" to work on TETRA's vessels.  Instead, Plaintiff continued, "to locate, train, and provide foreign labor to be used on [TETRA's] vessels", Dkt. No. 30, ¶ 4.15, from at least 2011 to 2015.

Simply put, there is no administrative record of Plaintiff's alleged "surplus" of American labor "qualified and available" to work on TETRA's vessels. The reason for the notice provision in 43 U.S.C. 1349(a)(2)(A), is simple, if the agency making a determination made a mistake it can be timely and efficiently corrected while the "violation of the Act" is alive. As stated above, the USCG exemptions are only valid for one (1) year. Plaintiff wants this court to "fix/remedy" "violations of the Act" that have long expired with **no** evidence on record before the administrative body or this Court of any **actual** violation. Plaintiff's inaction moots its challenge some eight (8) years after the fact.

"As a general rule, a party must exhaust all available avenues of administrative relief before seeking judicial review, 'in part because of the possibility that administrative review might obviate the need for judicial review.'" *Adams v. Berryhill*, 2017 WL 7038198, at *1 (S.D. Tex. Dec. 27, 2017), report and recommendation adopted, No. CV H-17-2572, 2018 WL 542284 (S.D. Tex. Jan. 22, 2018) (quoting *Garner v. United States Dep't of Labor*, 221 F.3d 822, 825 (5th Cir. 2000) (quoting *Hodges v. Callaway*, 499 F.2d 417, 423 (5th Cir. 1974)); *see Taylor v. United States Treasury Dep't*, 127 F.3d 470, 476 (5th Cir. 1997). "Under ordinary principles of administrative law a reviewing court will not consider arguments that a party failed to raise in timely fashion before an administrative agency." *Sims v. Apfel,* 530 U.S. 103, 114–15 (2000) (Breyer, J., dissenting) (citing *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33,

36–37 (1952); *Unemployment Compensation Comm'n of Alaska v. Aragon,* 329 U.S. 143, 155 (1946); *Hormel v. Helvering,* 312 U.S. 552, 556–57 (1941); 2 K. Davis & R. Pierce, *Administrative Law Treatise* § 15.8, pp. 341–44 (3rd ed. 1994)). Furthermore, the Supreme Court, in *Sims,* unanimously agreed, "in most cases, an issue not presented to an administrative decisionmaker cannot be argued for the first time in federal court." *Id.* at 112 (O'Connor, J., concurring in part and concurring in the judgment) ("On this underlying principle of administrative law, the Court is unanimous.") (citing the majority and the dissent). As the Court explained long ago:

> "[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts .... [C]ourts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."

*Id.* at 115 (Breyer, J., dissenting) (quoting *L.A. Tucker Truck Lines,* 344 U.S. at 37).

This ordinary rule has exceptions, but is especially important when made mandatory by a specific statute requiring exhaustion of remedies or issues. *See, e.g., Jones v. Bock,* 549 U.S. 199, 211 (2007). The Fifth Circuit has explained that "exceptions [to administrative exhaustion] apply ... only in extraordinary circumstances" and that "[t]here are limited bases for excusing administrative exhaustion." *Dawson Farms, LLC v. Farm Serv.*

*Agency,* 504 F.3d 592, 606 (5th Cir. 2007) (quoting *Cent. States Se. & Sw. Areas Pension Fund v. T.I.M.E.-DC, Inc.,* 826 F.2d 320, 329 (5th Cir. 1987)) (internal quotation marks omitted).

> "Traditional circumstances in which courts have excused a claimant's failure to exhaust administrative remedies include situations in which (1) the unexhausted administrative remedy would be plainly inadequate, (2) the claimant has made a constitutional challenge that would remain standing after exhaustion of the administrative remedy, (3) the adequacy of the administrative remedy is essentially coextensive with the merits of the claim (e.g., the claimant contends that the administrative process itself is unlawful), and (4) exhaustion of administrative remedies would be futile because the administrative agency will clearly reject the claim."

*Id.* (quoting *Taylor v. U.S. Treasury Dep't.,* 127 F.3d 470, 477 (5th Cir. 1997)).

In this case, Plaintiff has not explained why it did not exhaust the administrative remedies pursuant to § 1349, or that any "established exception" to this explicitly defined statutory "exhaustion" rule applies to Plaintiff's claims. Plaintiff was a sophisticated international business entity who business heavily involved the use of the USCG citizenship exemptions. By not exhausting its administrative remedies, and providing evidence to the Coast Guard/DOL of its claimed "surplus" of American labor, it waived its right to seek redress from this Court. S*ee Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938) ("no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.")

This Court is in no position now, some eight (8) years later, to determine whether the Coast Guard erred, or was in violation of the Act, when it granted the citizenship exemption to TETRA from 2011 to 2015. By failing to notify the Coast Guard of its alleged violation of the Act and failing to create a record before the administrative agency, Plaintiff is foreclosed from requesting judicial review of the USCG exemption decisions.

Three policies are commonly found underlying the exhaustion doctrine. Exhaustion is required when: (1) the nature of the case suggests that a factual record be developed prior to judicial review and that the issues would be more susceptible of judicial determination after being framed by the agency; (2) the agency should be first to exercise its discretion or the agency's expertise would aid the court in its determination; and (3) an agency could correct an error on its own volition obviating the need for judicial intervention altogether. *See McKart v. United States*, 395 U.S. 185, 194 (1969); *F.T.C. v. Standard Oil of California*, 449 U.S. 232 (1980).

All three primary policies underlying the exhaustion doctrine are implicated in the case now before us. First, the administrative record is devoid of any evidence that would assist this Court in its judicial review of Plaintiff's claim. This is due solely to Plaintiff's inaction of not notifying the USCG/DOL that their determination was in error as Plaintiff claims to have had a "surplus" of American labor. Plaintiff is asking this Court to act as the third line of review of

TETRA's exemption application, only this time years after the exemptions have expired.

Second, Plaintiff should have notified the Coast Guard and DOL that their rulings and administrative were erroneous as claimed by Vertex. The DOL is the agency with the expertise regarding the labor market and should have been given a second opportunity to exercise its discretion regarding TETRA's applications. Plaintiff's request to have this Court reevaluate the labor market and make a determination on TETRA's exemption applications years after their expiration is just not feasible. Plaintiff's inaction was the sole cause that prevented the agencies with the expertise regarding the labor market - Coast Guard/DOL - from timely reevaluating their administrative review process and decisions. Plaintiff cannot simply rely on a self-serving assertion that it did not notify the USCG/DOL because it would have been futile.

Third, the Coast Guard/DOL were in the best position to correct an error on their own volition obviating the need for judicial intervention altogether if Plaintiff would have notified them that there was, indeed, a "surplus" of American labor. The Court in *Consumers Union* suggested that if the circumstances are appropriate, this policy alone can form the basis for requiring exhaustion. *See Consumers Union of the United States, Inc. v. Cost of Living Council*, 491 F.2d 1396, 1400 (Em.App.), cert. denied, 416 U.S. 984 (1974).

The policy of allowing an agency the opportunity to discover and correct its own errors has its roots in the more "practical notions of judicial efficiency." *McKart*, 395 U.S. at 195. That is because, when an administrative action is timely appealed through the administrative process, the courts may never have to intervene. *Id*. The principle of administrative autonomy suggests that agencies should be given the first opportunity to correct their own errors. *McKart*, 395 U.S. at 19563. In fact, "the whole rationale of the exhaustion doctrine in the present context lies in purposes intimately related to the autonomy and proper functioning of the particular administrative system." *McGee v. United States*, 402 U.S. 479, 484 n.6 (1971).

Other substantial interests support the application of the exhaustion doctrine in this case. Primary among these is the substantial hardship involved in challenging the alleged improper findings by the Coast Guard/DOL at this very late date. The mechanics of the particular administrative scheme involved, as detailed in Paragraph 4 of the NVIC No. 7-84, does not merely require the Coast Guard/DOL to determine if there were available workers during the reference periods; the agencies had to determine if the workers were *qualified* to perform the jobs for which the exemptions were being sought. To reevaluate TETRA's applications dating as far back as eight (8) years would be a hugely impractical, if not impossible, task for this Court. The reevaluation would have to include reviewing the qualifications of the American labor that Plaintiff claims were

"qualified and available" (which might include interviewing these seamen). However, the record is devoid of any of these alleged available American labor's resumes/CVs or other documentation regarding their qualifications.

The Coast Guard/DOL could easily have corrected the alleged error and avoided the hardship/impossibility of this Court had Plaintiff made a timely challenge. *See Economou v. Butz*, 370 F.Supp. 361, 363 (S.D.N.Y. 1974), citing *Abbott Laboratories, Inc. v. Gardner*, 387 U.S. 136, 155 (1967) ("[T]he attempt to review a final order of an agency … almost two years after the issue of the order on alleged procedural deficiencies in its promulgation does not commend itself to a court of equity and seems inexcusable ....").

TETRA is mindful that the exhaustion doctrine, barring Plaintiff's claims, can be viewed as harsh. The failure to notify the Coast Guard/DOL of its alleged "surplus" of American labor, and the lengthy delay, however, was caused solely by Plaintiff. Every exemption granted by the Coast Guard that TETRA received was sent to Plaintiff. Year after year, TETRA made similar applications, received the approval of the Coast Guard and the DOL to use foreign workers, and Plaintiff continued to locate and provide TETRA with foreign workers. Plaintiff failed to notify the Coast Guard of its claims when the exemptions were initially provided to TETRA and remained silent during the time that Vertex was profiting from the exemptions and the two (2) years thereafter. Plaintiff simply could not have been

17

seriously prejudiced by the alleged improprieties when it participated in the alleged scheme for so long without raising the issue.

The nature of the circumstances in this case are such that Plaintiff was required to exhaust its administrative remedies in a timely manner. Plaintiff's failure prevents it from maintaining an action at this late date. This quite simply is a situation in which "a litigant's claims [have lost] vitality because the litigant ... failed to contest [its] rights in an administrative forum." *McGee*, 402 U.S. at 483.

## V.
## CONCLUSION

As can be seen by the law and facts of this case, Plaintiff is barred from bringing this suit. The following are uncontested facts in this case:

1. Plaintiff was aware that TETRA was applying for citizenship exemptions.

2. Plaintiff knew of, should have known, that TETRA's application for the exemptions asserted that there were not "qualified and available" American labors.

3. Plaintiff received the exemptions granted by the USCG, which stated that the USCG finding was "based, in part, on a determination made by the Department of Labor, Employment and Training Administration, Office of Foreign Labor Certification, that there are not a sufficient number of citizens of the United States or resident aliens qualified and available for the work needed to be performed."

4. Plaintiff received and read the USCG exemption approvals.

5. Plaintiff did not notify the USCG or the DOL that it had an alleged "surplus" of American labor that was "qualified and available" to serve of TETRA's vessels.

6. The administrative records before the USCG and DOL are devoid of any of Plaintiff's allegations.

7. Plaintiff continued year after year "to locate, train, and provide foreign labor to be used on [Tetra] vessels." Dkt. No. 30 (First Amended Complaint), ¶ 4.15.

8. The USCG and DOL were in the best position to remedy Plaintiff's claims that the Act was being violated by TETRA seeking and receiving the citizenship exemptions.

9. All of the citizenship exemptions that Plaintiff complaints of have long expired.

10. Plaintiff has no reason for failing to exhaust its administrative remedies before the USCG or DOL.

11. Plaintiff was silent regarding the use of foreign workers while it was profiting from them.

For all of the above, Plaintiff's claims are barred, this Court should grant this motion and dismiss all of Plaintiff's claims, and render final summary judgment in TETRA's favor.

Respectfully submitted,

*Glenn R. Legge*
**Glenn R. Legge**
TBA 12171330
Fed. ID 5420
5151 San Felipe, Suite 400
Houston, Texas 77056
Telephone No.:   (713) 917-0888
Facsimile No.:   (713) 953-9470
**ATTORNEY FOR DEFENDANTS TETRATECHNOLOGIES, INC. AND TETRAAPPLIED TECHNOLOGIES, LLC**

OF COUNSEL:
**HOLMAN FENWICK WILLAN USA LLP**
Jeanie Tate Goodwin
TBA: 24046949  Fed ID: 592456
Jeanie.Goodwin@hfw.com
Sheshe Taylor Evans
TBA: 24047800  Fed ID: 37745
Sheshe.Evans@hfw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy was served via ECF on this 6th day of September 2019 to:

Francis I. Spagnoletti
401 Louisiana, 8th Floor
Houston, Texas 77002
Telephone: (713) 653-5600
Facsimile:  (713) 653-5656
Email: fpagnoletti@spaglaw.com

*Glenn R. Legge*
**Glenn R. Legge**
